# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# MILWAUKEE DIVISION

| | |
|---|---|
| William Green, individually and on behalf of all others similarly situated, | 2:22-cv-01444 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Meijer, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. Meijer, Inc. ("Defendant") manufactures, markets, labels and sells pain relief patches promising to deliver 4% lidocaine under the Meijer brand ("Product").



2. Lidocaine is a topical anesthetic used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain.

3. Representations about the Product's potency include "Lidocaine Pain Relief Patch," "Topical Anesthetic 4% Lidocaine," described as "Maximum Strength" to "Temporarily relieve[s] minor pain & desensitize[s] aggravated nerves."

4. Representations about the Product's adhesive attributes indicate it "Stays in Place" when applied to "Back & Large Areas," shown by a picture of the patch applied to the lower back, confirmed by the back panel Directions to "[U]se one patch for up to 12 hours," but that "[the] Flexible patch is [also] easy to remove."



## I. PRODUCT FAILS TO DELIVER LIDOCAINE IN PROMISED WAY

5. In 2003, the Food and Drug Administration ("FDA") began reviewing over-the-counter ("OTC") skin patches to determine the safe and effective concentration of lidocaine.

6. The FDA concluded that these transdermal drug delivery systems, used in the Product, systematically fail to adhere to the body.

7. Since adequate adhesion is critical for such delivery systems, if a patch lifts or detaches while walking, sleeping or exercising, dosing will be compromised.

8. The FDA Adverse Events Reporting System revealed that approximately 70% of consumer complaints about such products relate to their poor adhesion.

9. A 2021 study in the Journal of Pain Research of lidocaine patches similar to the one sold by Defendant found that about half the time they failed to completely adhere for the promised duration of eight hours.

10. These figures understate the adhesion failures because the study required participants be sedentary while the patches were applied.

11. Consumers seeing the statements describing the Product as "Stay[ing] in Place" yet "easy to remove" when applied to "[the] Back & Large Areas," and the directive to "[U]se one patch for up to 12 hours," will expect it will adhere to their bodies for no less than twelve hours.

12. These statements are misleading for multiple reasons.

13. First, studies have shown the Product is unable to adhere to the skin and "Stay[] in Place" for more than four hours, and often peels off within minutes of light activity, nowhere near the twelve hour maximum usage time indicated.

14. This inability to adequately adhere under normal use renders adhesion claims misleading due to the significant disparity in what was promised compared to what consumers received.

15. Second, the directive to "[U]se one patch for up to 12 hours" with the description that "[the] patch is [also] easy to remove" misleads consumers because these statements assume the Product will not have detached within that time period and that it will need to be manually removed.

## II. MAXIMUM STRENGTH CLAIM IS MISLEADING

16. The representation of "Maximum Strength" is misleading for multiple reasons.

17. First, this statement tells consumers the Product contains and delivers the maximum amount of lidocaine available in patch form and is superior or equivalent in efficacy and results to other OTC and prescription-strength lidocaine patches.

18. However, newly developed adhesive technology delivers the bioequivalence of 5%

lidocaine in patch form and maintains adhesion for at least eight hours under normal conditions.[1]

19. Second, numerous studies and reports revealed that users of adhesive lidocaine patches using the same technology used by the Product regularly peel off a user's skin within three to four hours, and sometimes minutes, after being applied.

20. Since, according to the FDA, the actual strength of a lidocaine patch is measured by the "mass of drug relative to the mass of the adhesive per patch" delivered to the target area, these adhesion deficiencies cause the delivery and absorption of lidocaine to be greatly reduced.

21. This inability to adhere for anywhere close to twelve hours means the Product cannot deliver the "Maximum Strength" amount of lidocaine.

### III. DESENSITIZING CLAIMS

22. The Product's promise to "desensitize[s] aggravated nerves" is misleading because, according to the FDA, this implies to consumers it will completely block and numb nerves and pain receptors, eliminate responses to painful stimuli, and treat neuropathic and musculoskeletal pain, including back and spinal pain.

23. The FDA found that users of such products associate these types of statements with medical treatments requiring a prescription and FDA approval.

24. However, the Product is available without a prescription and is not approved by the FDA.

25. The front label promise to "desensitize[s] aggravated nerves" is misleading and inconsistent with its limited approval as able to "[T]emporarily relieve[s] minor pain," indicated in the "Use" section of the Drug Facts and on the front label.

---

[1] In studies, this technology maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).



## IV. CONCLUSION

26. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

27. As a result of the false and misleading representations, the Product are sold at a premium price, approximately no less than no less than $9.39 per box of six patches, excluding tax and sales, higher than similar Product, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

28. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

29. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

30. Plaintiff is a citizen of Wisconsin.

31. Defendant is a Michigan corporation with a principal place of business in Grand Rapids, Kent County, Michigan.

32. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years from Defendant's more than two hundred and forty stores and its website, across the States covered by Plaintiff's proposed classes.

33. Venue is in this District with assignment to the Milwaukee Division because a substantial part of the events or omissions giving rise to these claims occurred in Milwaukee and/or

Racine County, including Plaintiff's purchase and/or use of the Product and awareness and/or experiences of and with the issues described here.

## Parties

34. Plaintiff William Green is a citizen of Racine, Racine County, Wisconsin.

35. Defendant Meijer, Inc. is a Michigan corporation with a principal place of business in Grand Rapids, Michigan, Kent County.

36. Meijer was founded as Meijer's Grocery in 1934 by barber Hendrik Meijer and his son Fred.

37. The Meijer family's principles shaped the future of the company.

38. Fred Meijer wanted to "leave the world in a little better shape than when [he] entered it," which in the retail context meant dependable merchandise and fair business practices.

39. In 1962, Meijer revolutionized the retail experience by opening the first ever supercenter, selling clothing, groceries, and hardware under one roof.

40. It was even named "Retailer of the Year" in 2015 by *Progressive Grocer*, the largest trade publication of the grocery industry.

41. Today, the company has more than 250 stores throughout Michigan, Illinois, Indiana, Kentucky, Ohio, and Wisconsin.

42. Meijer has been known for its values and unique approach to business and community, through its ethics, transparency to investors and customers, and philanthropy.

43. While Meijer sells leading national brands, it also sells a large number of OTC products under one of their private label brands, Meijer.

44. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

45. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

46. Products under the Meijer brand have an industry-wide reputation for quality and value.

47. In releasing products under the Meijer brand, Defendant's foremost criteria was high-quality, equal to or better than the national brands.

48. Defendant was and is able to get national brands to produce its private label items due its loyal customer base, history of high quality items and tough negotiating.

49. That Meijer branded products met this high bar was proven by focus groups, which rated them above the name brand equivalents.

50. Private label products generate higher profits because national brands spend significantly more on marketing, contributing to their higher prices.

51. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

52. Private label products under the Meijer brand benefit by their association with consumers' appreciation and awareness of the Meijer brand as a whole.

53. The development of private label items is a growth area for Meijer, as it selects only top suppliers to develop and produce Meijer products.

54. Plaintiff purchased the Product at locations including Meijer, 5800 W Layton Ave, Greenfield, WI 53220 between June 2020 and November 2022, or among other times.

55. Plaintiff purchased the Product to provide pain relief to his back and other areas of his body.

56. Plaintiff saw the Product was labeled and marketed as "Maximum Strength" and capable of delivering 4% lidocaine for "Up to 12 Hours," and would "desensitize aggravated nerves" and provide at least "temporary relief" to his back and other areas of his body.

57. Plaintiff believed and expected the Product would reliably adhere to his body to deliver 4% lidocaine for not less than twelve hours, that it was the maximum strength available, would relieve pain, and deliver pain relief through desensitizing aggravated nerves, because that is what the representations and omissions said and implied.

58. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

59. However, the Product did not reliably adhere to Plaintiff's body for anywhere close to twelve hours, which prevented it from providing even temporary pain relief.

60. Plaintiff bought the Product at or exceeding the above-referenced price.

61. Plaintiff paid more for the Product than he would have had he known the representations and omissions were false and misleading, or would not have purchased it.

62. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

63. Plaintiff chose between Defendant's Product and similarly represented yet truthful products which did not misrepresent their attributes, features, and/or components.

64. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance its representations are consistent with its abilities, attributes, and/or features.

65. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar pain relief patches, because he is unsure whether those representations are truthful.

## Class Allegations

66. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Wisconsin Class:** All persons in the State of Wisconsin who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Michigan, Ohio, Indiana, and Kentucky who purchased the Product during the statutes of limitations for each cause of action alleged.

67. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

68. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

69. Plaintiff is an adequate representative because his interests do not conflict with other members.

70. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

71. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

72. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

73. Plaintiff seeks class-wide injunctive relief because the practices continue.

## Wisconsin Deceptive Trade Practices Act ("DTPA"), Wis. Stat. § 100.18(1) and Unfair Trade Practices Act ("UTPA"), Wis. Stat. § 100.20

74. Plaintiff incorporates by reference all preceding paragraphs.

75. Plaintiff believed the Product would reliably adhere to his body and provide a continuous dose of maximum strength lidocaine to desensitize nerves and relieve pain.

76. Wisconsin has adopted the regulations and interpretations of the FDA with respect to OTC products.

77. Wis. Stat. § 100.20(2) prohibits unfair trade practices and allows the Department of Agriculture, Trade and Consumer Protection ("DATCP") to forbid such methods.

78. Wis. Stat. § 100.20(5) permits "[A]ny person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefor in any court of competent jurisdiction."

79. Defendant violates § ATCP 90.02(1) because the Product's representations including "Maximum Strength" are false and misleading.

80. Plaintiff suffered a pecuniary loss due to Defendant's violation of Wis. Admin. Code §§ ATCP 90 *et seq.*

81. Defendant violates Wis. Stat. § 100.18 because the representations on the Product were made to the public with intent to induce an obligation, their purchases, the representations were untrue, deceptive or misleading and caused Plaintiff a pecuniary loss.

82. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

83. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Violation of State Consumer Fraud Acts
### (Consumer Fraud Multi-State Class)

84. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

85. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

86. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

## Breaches of Express Warranty,
### Implied Warranty of Merchantability/Fitness for a Particular Purpose
### and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

87. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it would reliably adhere to his body and provide a continuous dose of maximum strength lidocaine to desensitize nerves and relieve pain.

88. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

89. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

90. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it would reliably adhere to his body and provide a continuous dose of maximum strength lidocaine to desensitize nerves.

91. Defendant's representations affirmed and promised that the Product would reliably

adhere to his body and provide a continuous dose of maximum strength lidocaine to desensitize nerves.

92. Defendant described the Product so Plaintiff believed that they would reliably adhere to his body and provide a continuous dose of maximum strength lidocaine to desensitize nerves, which became part of the basis of the bargain that it would conform to its affirmations and promises.

93. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

94. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high-quality Meijer brand.

95. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

96. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

97. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

98. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

99. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because they were marketed as if they would reliably adhere and provide a continuous dose of maximum strength lidocaine to desensitize nerves.

100. The Product was not merchantable because Defendant had reason to know the particular purpose for which it was bought by Plaintiff, because he expected it would reliably adhere to his body and provide a continuous dose of maximum strength lidocaine to desensitize nerves, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

### Negligent Misrepresentation

101. Defendant had a duty to truthfully represent the Product, which it breached.

102. This duty was non-delegable, based on Defendant's holding itself out as having special knowledge and experience in this area, custodian of the Meijer brand, recognized for the highest quality OTC products that exceed their national brand counterparts.

103. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency, and putting customers first, that it has been known for.

104. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

105. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

106. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Product.

107. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages

### Fraud

108. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it would not adhere for anywhere close to the hours indicated, rendering the "Maximum

Strength" claim false, and was unable to desensitize nerves.

109. Defendant's experience in the sale of OTC products provided it the ability to ensure the products it sold were represented truthfully, yet willingly failed to do so.

<u>Unjust Enrichment</u>

110. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory and/or punitive damages and interest;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated: December 4, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com